David S. Stone
Eric H. Jaso
Jason C. Spiro
**Stone & Magnanini LLP**
150 JFK Parkway,
Short Hills, NJ 07078
Phone (973) 218-1111
Facsimile (973) 218-1106

David Anziska
**The Law Offices of David Anziska**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437

Jesse Strauss
**Strauss Law PLLC**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437

*Counsel for Plaintiffs, individually*
*and for all others similarly situated*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHN HARNISH,<br>JUSTIN SCHLUTH,<br>EDWARD GILSON, ROBERT<br>KLEIN, and ROBERT MACFADYEN,<br>on behalf of themselves<br>and all others similarly situated, | : <br> : <br> : <br> : <br> : <br> : <br> : | **Civil Action No.**_____ |
| Plaintiffs, | : <br> : | **CLASS ACTION COMPLAINT** |
| v. | : <br> : | |
| WIDENER UNIVERSITY SCHOOL<br>OF LAW, and<br>DOES 1-20, | : <br> : <br> : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

Plaintiffs, on behalf of themselves and all other persons similarly situated, allege, based on the investigation of counsel and their personal knowledge, as follows:

## PRELIMINARY STATEMENT

"*Sunlight is said to be the best of disinfectants. . .*" – Justice Louis Brandeis

1.	This action seeks to remedy a systemic, ongoing fraud that is prevalent in the legal education industry and threatens to leave a generation of law students in dire financial straits. Essentially, Plaintiffs seek transparency in the way law schools report post-graduate employment data and salary information, by immediately requiring that they make critical, material disclosures which will give both prospective and current students a more accurate picture of the value of their law school education and their likelihood of obtaining future permanent placements in the legal profession.

2.	With approximately 1,500 students, including over 450 part-time students, spread across two campuses, Widener University School of Law ("WLS") is one of the largest law schools in the country. Indeed, WLS's enormous class size is a point of pride for the school, which boasts to prospective students that "[a]s a graduate of Widener Law, you'll join a network of more than 12,000 alumni in 50 states, the District of Columbia, and 15 countries and territories who are using their Widener Law degrees to pursue successful, rewarding careers." Further, the school claims that "[o]ur graduates have established successful careers in traditional legal fields, such as government and private practice, as well as in nontraditional legal positions, such as presidents of large corporations, broadcast journalists, and administrators in higher education and medicine." "Our successful alumni are employed across the country as partners, CEOs, CFOs, judicial law clerks, and top government attorneys," and they are "happy to lend their insight, expertise, and connections to our new law students." All of these myriad

opportunities and alumni connections, the school insists, result in a placement rate of well over 90 percent, a number which puts it on par with much higher ranked law schools.

3.     The reality is very different.  WLS fails to fulfill its placement claims.  The vast majority of WLS law students are not immediately placed in secure, full-time legal jobs following graduation, As a result, WLS students do not receive the promised value of a WLS degree.  They are instead saddled with tens of thousands of dollars in non-dischargeable debt that will take  decades to pay off.  The school has done this while misrepresenting and manipulating its employment statistics to prospective students, employing the type of "Enron-style" accounting techniques that would leave most for-profit companies facing government investigations and the prospect of substantial civil fines.  These deceptions are perpetuated so as to prevent prospective students from realizing the obvious -- that attending WLS and paying nearly $120,000 in tuition payments makes no economic sense.

4.     Specifically, WLS, through both its print and Internet marketing materials, made one fundamental uniform, written misrepresentation**,** claiming, with Madoff-like consistency, that the overwhelming majority of its graduates during the class period -- roughly between 90 and 96 percent -- secure "employment" within nine months of graduation.  The clear implication is that employment means permanent employment in the legal profession.  In reality, these figures are false and/or misleading because they include *any* type of employment, including jobs that have absolutely nothing to do with the legal industry, do not require a JD degree or are temporary or part-time in nature.   Rather, if WLS had disclosed the more pertinent employment statistic -- i.e. those graduates who have secured full-time, permanent positions for which a JD degree is required or preferred -- the numbers drop dramatically, and could be well below *40 percent*, if not even lower.

5.      Compounding those problems, there has been no place where prospective students can find WLS's "real" employment numbers.  The school supplies the same false and misleading statistics to the *U.S. News & World Report* ("*US News*") and the American Bar Association ("ABA"), the two primary sources of information for law school employment data.  Using the data provided by WLS, the ABA and *U.S. News* report as "employed" those who have secured employment in *any* capacity in *any* kind of job, no matter how unrelated to the legal field.

6.      WLS's representations about employment and placement data have been false and/or misleading for the following reasons:

        a)      WLS's reported placement rates have remained consistently steady following the aftermath of the "Great Recession," as its reported placement rates were 94 percent for the Class of 2009 and 93 percent for the Class of 2010.  Currently, the legal employment market is highly oversaturated, with law schools churning out 43,000 JD degrees each year, even though roughly half as many jobs are available (26,000).  Yet, with legal jobs becoming increasingly scarce, WLS, instead of telling the sobering truth to prospective and current students, continues to make the fantastical claim that the overwhelming majority of its graduates are gainfully employed in the legal profession.

        b)      As set forth in detail below, the employment and salary data reported by WLS are starkly at odds with employment statistics reported by the National Association of Law Placement ("NALP") -- 40 percent for law school graduates who secure full-time, permanent legal employment -- despite its ranking in the fourth or bottom tier of all accredited law schools by *US News*.

7.      Unfortunately, WLS's false and fraudulent representations and omissions are apparently endemic in the law school industry.   It is an industry secret that law schools employ a

variety of deceptive practices and accounting legerdemain to make themselves more attractive to prospective students, including, among other things, hiring recent unemployed graduates as "research assistants" or providing them with "public interest" stipends so as to classify them as employed, excluding graduates who do not supply employment information from employment surveys, refusing to categorize unemployed graduates who are not "actively" seeking employment as unemployed, and classifying graduates who have only secured temporary, part-time employment as being "fully" employed.

8.    Similarly, by misrepresenting its employment data, WLS created an impression of a bountiful employment opportunity that in reality does not exist, and caused Plaintiffs to overvalue the prospects of their WLS education and take on substantial debt to finance their WLS education.  According to *US News*, WLS students graduate on average with a whopping *$111,909* in loans, placing them in the top 30th percentile of indebtedness among all law school graduates.  The 2010-2011 tuition for Widener was $34,890, excluding fees and living expenses, making it one of the most expensive law schools in the country.

9.    To a remarkable degree, WLS and the law school industry in general have been astonishingly successful in deceiving prospective students about the value of a law degree in an effort to maintain and increase both enrollment and tuition.  Last year, a record 51,426 first-year students enrolled in law schools, up by over 60 percent from 1971, while WLS's enrollment has held steady throughout the recession.  Additionally, tuition at WLS  -- much like the rest of the law school industry -- has risen exponentially over the past two decades, far exceeding both inflation and any increase in attorneys' starting salaries, and since 2006 alone has increased by about 20 percent.

10.    The dramatic increase in law school tuition has dovetailed with the dramatic

increase in faculty compensation.  Law school deans are perhaps the best remunerated in

academia today, enjoying both lavish perks and exorbitant salaries that rival those of Fortune 500

executives.  For example, during the fiscal 2009 year, WLS's dean Linda Ammons earned a

staggering $305,761 in total compensation.

11.     Senator Barbara Boxer of California and Senator Charles Grassley of Iowa have

each sent multiple letters to the President of the ABA, taking the organization to task for failing

to properly police law schools.  Additionally, a coalition of 55 law school student body

presidents have sent to Congress proposed legislation that would, among other things, create new

reporting standards for employment data, require law schools to submit annual employment

reports to the Department of Education ("DOE"), and empower the DOE to audit these reports.

12.     Accordingly, Plaintiffs now assert claims for violations of: a) Delaware's

Deceptive Trade Practices Act, 6 Del. C. §§2531-36, *et seq.*  Plaintiffs seek damages and

equitable relief on behalf of the Class (as defined in paragraph _____ herein), which includes

but is not limited to the following: refunding and reimbursing current and former students for

tuition paid to WLS; an order enjoining WLS from continuing to market false and inaccurate

employment data and salary information; an order requiring that WLS retain a third party to

independently audit all employment and salary data; costs and expenses, including attorneys' and

experts' fees; and any additional relief that this Court determines to be necessary or appropriate

to provide complete relief to Plaintiffs and the proposed class.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and

1367, because the Plaintiffs reside in various states, including Pennsylvania and New Jersey, and

are therefore diverse from Defendant WLS which is based in Delaware, and the amount in

controversy exceeds the sum or value of $75,000.

14.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)("CAFA"), as to the named Plaintiffs and every member of the Class, because the proposed Class contains more than 100 members, the aggregate amount of controversy exceeds $5 million, and members reside across the U.S. and are therefore diverse from the Defendants.   For the class of 2010, only 16 percent of graduates practiced in Delaware, while 57 percent practiced in Pennsylvania and 16 percent practiced in New Jersey.

15.     The Court has personal jurisdiction over Defendant WLS, because they have purposefully availed themselves of the privilege of conducting activities in the forum, such as a deliberate targeting of the forum through advertisements, and therefore have significant minimum contacts with this state.  Indeed, they have availed themselves to the laws and markets of New Jersey through the promotion, marketing and advertising of WLS in this State and on the Internet to consumers in New Jersey.

16.     Venue is proper within this district pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

I.    **Plaintiffs**

17.      John Harnish currently works as a bartender in Philadelphia, Pennsylvania who lives in Delaware County, Pennsylvania.  Mr. Harnish graduated from WLS's Delaware Campus in 2009, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars of debt.  In applying and deciding to remain enrolled at

WLS, Mr. Harnish relied on salary data and employment information posted on WLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on WLS's representations that, depending on the year, approximately 90-95 percent of its graduates were employed within nine months of graduation. Indeed, prior to Mr. Harnish enrolling in WLS, the school represented that about 90 percent of 2005 graduates secured employment within nine months of graduation, and while Mr. Harnish was enrolled in WLS the school posted on its website an employment report asserting that 96 percent of 2007 graduates secured employment within nine months of graduation. Furthermore, Mr. Harnish when applying and deciding to remain enrolled in WLS was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Harnish would have been eligible for even without obtaining a JD degree and paying WLS's tuition.  Had Mr. Harnish been aware that WLS's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to WLS or perhaps not attend the school at all.  Following his graduation, faced with bleak prospects for full-time legal employment, Mr. Harnish decided to continue to work as a bartender.

18.     Justin Schluth is currently unemployed.  He lives in New Jersey and is a member in good standing of the Pennsylvania Bar.  Mr. Schluth graduated from WLS's Delaware campus in 2010, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars of debt.  In applying and deciding to remain enrolled at WLS, Mr. Schluth relied on employment data and salary information posted on WLS's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US*

*News*.  In applying and deciding to remain enrolled at WLS, Mr. Schluth relied on salary data and employment information posted on WLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on WLS's representations that, depending on the year, approximately 90-95 percent of its graduates were employed within nine months of graduation. Indeed, prior to Mr. Schluth enrolling in WLS, the school represented that about 90 percent of 2005 graduates secured employment within nine months of graduation, and while Mr. Schluth was enrolled in WLS the school posted on its website an employment report asserting that 96 percent of 2007 graduates secured employment within nine months of graduation.  Furthermore, Mr. Schluth when applying and deciding to remain enrolled in WLS was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Schluth would have been eligible for even without obtaining a JD degree and paying WLS's tuition.  Had Mr. Schluth been aware that WLS's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to WLS or perhaps not attend the school at all.  Following his graduation from law school, Mr. Schluth continued his education at WLS, where he completed an LLM in 2010.  Currently, he is looking to secure full-time, permanent legal employment, which he has not received despite being admitted to the Pennsylvania Bar.

19.    Edward Gilson currently lives and works in Philadelphia and is a member in good standing of the Pennsylvania Bar.  Mr. Gilson graduated from WLS's Delaware campus in 2009, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars of debt.  In applying and deciding to remain enrolled at WLS, Mr. Gilson

relied on employment data and salary information posted on WLS's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*.  In applying and deciding to remain enrolled at WLS, Mr. Gilson relied on salary data and employment information posted on WLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on WLS's representations that, depending on the year, approximately 90-95 percent of its graduates were employed within nine months of graduation.  Indeed, prior to Mr. Gilson enrolling in WLS, the school represented that about 90 percent of 2005 graduates secured employment within nine months of graduation, and while Mr. Gilson was enrolled in WLS the school posted on its website an employment report asserting that 96 percent of 2007 graduates secured employment within nine months of graduation.  Furthermore, Mr. Gilson when applying and deciding to remain enrolled in WLS was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Gilson would have been eligible for even without obtaining a JD degree and paying WLS's tuition.  Had Mr. Gilson been aware that WLS's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to WLS or perhaps not attend the school at all.  Following his graduation from law school, Mr. Gilson could not find a permanent position in the legal industry, despite sending out hundreds of resumes.  He currently owns and operates his own law firm.

20.     Robert Klein currently works in a non-legal position with the Federal Government.  He is licensed to practice in Pennsylvania and New Jersey and is a member in good standing of both state bars.  He currently lives in New Jersey and works in Philadelphia.

Mr. Klein graduated from WLS's Delaware campus in 2009, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars of debt.  In applying and deciding to remain enrolled at WLS, Mr. Klein relied on employment data and salary information posted on WLS's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*.  In applying and deciding to remain enrolled at WLS, Mr. Klein relied on salary data and employment information posted on WLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on WLS's representations that, depending on the year, approximately 90-95 percent of its graduates were employed within nine months of graduation. Indeed, prior to Mr. Klein enrolling in WLS, the school represented that about 90 percent of 2005 graduates secured employment within nine months of graduation, and while Mr. Klein was enrolled in WLS the school posted on its website an employment report asserting that 96 percent of 2007 graduates secured employment within nine months of graduation.  Furthermore, Mr. Klein when applying and deciding to remain enrolled in WLS was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. Klein would have been eligible for even without obtaining a JD degree and paying WLS's tuition.  Had Mr. Klein been aware that WLS's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to WLS or perhaps not attend the school at all.  Following his graduation from law school, Mr. Klein could not find a permanent position in the legal industry, despite sending out hundreds of resumes.

   21.  Robert MacFadyen  lives in Bergen County, New Jersey and currently works for

a management company in a non-legal capacity. Mr. MacFadyen graduated from WLS's Harrisburg campus in 2008, and in total paid tens of thousands of dollars in tuition and fees to the school while incurring tens of thousands of dollars of debt. In applying and deciding to remain enrolled at WLS, Mr. MacFadyen relied on employment data and salary information posted on WLS 's website and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*. In applying and deciding to remain enrolled at WLS, Mr. MacFadyen relied on salary data and employment information posted on WLS's website, marketing material and/or disseminated to third-party data clearinghouses and publications, such as the ABA and *US News*, and specifically relied on WLS's representations that, depending on the year, approximately 90-95 percent of its graduates were employed within nine months of graduation. Indeed, prior to Mr. MacFadyen enrolling in WLS, the school represented that about 90 percent of 2004 graduates secured employment within nine months of graduation, and while Mr. MacFadyen was enrolled in WLS the school posted on its website an employment report asserting that 90 percent of 2005 graduates secured employment within nine months of graduation. Furthermore, Mr. MacFadyen when applying and deciding to remain enrolled in WLS was unaware that the school's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred -- employment Mr. MacFadyen would have been eligible for even without obtaining a JD degree and paying WLS's tuition. Had Mr. MacFadyen been aware that WLS's reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, he would have elected to either pay less to WLS or perhaps not attend the school at all. Following his graduation from law school, Mr. MacFadyen could not find a position in the legal industry, despite sending out hundreds of resumes.

## II.   <u>Defendants</u>

22.     Defendant WLS is an ABA accredited law school based in Wilmington, Delaware with a satellite campus in Harrisburg, Pennsylvania.  All policies and procedures, including the content of its marketing materials, are issued from its Wilmington campus. For the 2010-2011 academic year, it enrolled approximately 1,450 students, including 455 part-time students, and currently it enrolls approximately 1,600 students.  About 1,100 students attend the Wilmington campus, which was founded in 1971, and 500 students attend its Harrisburg campus, which was founded in 1989.

23.     Tuition at WLS for the 2010-2011 was $34,890 for full-time students, while room and board is estimated to be about at least $20,000 if not more, bringing the total annual cost for attending WLS to approximately $55,000.

24.     The true names and capacities (whether individual, corporate, associate or otherwise) of Defendants Does 1 though 20, inclusive, are unknown to Plaintiffs.  Plaintiffs sue these Defendants by fictitious names and will seek leave to amend this Complaint after their identities are learned.  Each fictitious Defendant contributed to the acts and practices alleged herein.  Plaintiffs are informed and believe that the fictitiously named Defendants proximately caused Plaintiffs' damages.

## <u>FACTUAL ALLEGATIONS</u>

25.     Enrolling roughly 1,600 students annually, WLS' enrollment has risen dramatically over the past few decades.  WLS currently enrolls one of the largest student bodies in the country.

26.     According to *US News*, WLS has some of the lowest admissions standards of any accredited or provisionally accredited law school.  For 2010, it accepted approximately 59

percent of all applicants, one of the highest acceptance rates of any law school. Its median LSAT

score is 151 and median GPA is 3.14, both of which are well within bottom of all schools.

27.     Nevertheless, WLS does not apparently strive to keep these multitudes of

students.  In 2008, for example, approximately 23 percent of the roughly 1,500 students who

enrolled in WLS failed to matriculate for their second year, while second-year students still

enjoyed an attrition rate of 2.3 percent.

28.     WLS is part of the Widener University, a private, multi-campus university whose

main campus is in Chester, Pennsylvania, and which has campuses in Harrisburg, Exton and

Wilmington. The university enrolls in total 6,630 students per year, divided roughly evenly

between undergraduates and graduates.

29.     WLS is accredited by the ABA's Section of Legal Education and Admissions to

the Bar.   As mandated by Section 509(a) of the ABA's 2010-2011 Standards for Approval of

Law Schools ("Section 509(a)"), an accredited law school must "publish basic consumer

information" in a "fair and accurate manner reflective of actual practice."

30.     WLS publishes its employment statistics on its website under the "Career

Services" tab.  In posting the data, the school boasts to prospective students that "[a]s a graduate

of Widener Law, you'll join a network of more than 12,000 alumni in 50 states, the District of

Columbia, and 15 countries and territories who are using their WLS degrees to pursue

successful, rewarding careers." Further, the school claims that "[o]ur graduates have established

successful careers in traditional legal fields, such as government and private practice, as well as

in nontraditional legal positions, such as presidents of large corporations, broadcast journalists,

and administrators in higher education and medicine."  "Our successful alumni are employed

across the country as partners, CEOs, CFOs, judicial law clerks, and top government attorneys,"

and they are happy to lend their insight, expertise, and connections to our new law students." All of these myriad opportunities and alumni connections, the school insists, result in a placement rate of well over 90 percent, a number which puts it on par with much higher ranked law schools.

31.     Currently, WLS posts on its website the employment data and salary information for the class of 2010.  *See* WLS's 2010 Employment Data (the "2010 Employment Report") (attached as Ex. 1).  This information is obtained by job surveys that WLS sends out to all recent graduates, and all information contained in this report is unaudited, unverified and self-reported. According to the 2010 Employment Report, approximately 93 percent of the class were employed or pursuing advanced degrees within nine months of graduation, including 52 percent in private practice, five percent in business, ten percent in government, six percent in public interest and 27 percent in judicial clerkships.

32.      Throughout the Class period, the placement numbers are equally as inflated.  For example, for the class of 2007, approximately 96 percent of the class were employed or pursuing advanced degrees within nine months of graduation, including 49 percent in private practice, seven percent in business, thirteen percent in government, three percent in public interest and 30 percent in judicial clerkships. *See* WLS's 2007 Employment Data (the "2007 Employment Report") (attached as Ex. 2).

33.     For the classes of 2008 and 2009, WLS enjoyed placement rates well above 90 percent and the national average. *See* WLS's 2008-2009 Employment Profile (the "2008-2009 Employment Profile") (attached as Ex. 3).

34.     If anything, WLS's employment record has increased over the past decade, despite the economic turbulence since 2008.  For example, WLS's placement rates for the classes of 2004 and 2005 were 90 percent respectively.  *See* WLS's Employment Data for Class of 2004

& 2005 (the "2004 & 2005 Employment Reports" (attaching Ex. 4).

35.    Thus, the employment data posted by WLS during the Class period makes a number of startling factual omissions that would give prospective students a more accurate picture of their post-graduation employment prospects.  Indeed,  WLS simply presents an overall employment number, and fails to break down what percentage of graduates were employed in either part-time or temporary positions, or whether a job requires a JD degree.  Accordingly, based on these classifications, a graduate could be working as a barista in Starbucks -- or toiling away in *any* capacity in *any* kind of job, no matter how menial or poorly compensated or unrelated to law -- and would be deemed employed and working in "business," even though such employment is clearly temporary in nature and obviously does not require a JD degree. Similarly, a contract attorney who has yet to secure permanent employment and is forced to toil away in transitory document review projects would be deemed "employed" under WLS's broad guidelines.

36.    The school also disseminates misleading employment data and salary information to other sources that are advertised and readily available to prospective students.   In general, there are three primary sources that WLS -- along with all other accredited law schools -- provides such information to:  *US News,* the ABA and the National Association of Law Placement ("NALP").[1]

37.    Based on data supplied by WLS, the ABA reported that 86 percent of 2005 WLS graduates, 82 percent of 2006 WLS graduates, 84 percent of 2007 WLS graduates, 90 percent of 2008 WLS graduates and 90 percent of 2009 WLS graduates secured employment within nine

---

[1] All ABA-accredited and provisionally-accredited law schools are required to provide employment data to the ABA, but only submit such data to *U.S. News* and NALP on a voluntary basis.

months of graduation, while *U.S. News* reported that 83 percent of 2006 WLS graduates, 88.5 percent of 2007 WLS graduates, 91 percent of 2008 WLS graduates and 78 percent of 2009 WLS graduates secured employment within nine months of graduation.

38.     In a letter sent to the deans of all accredited law schools, Brian Kelly, the editor-in-chief of the *US News*, essentially conceded this point, acidly noting that the "entire law school sector is perceived to be less than candid" when reporting employment data, and that many schools appear "not to treat the ABA reporting rules with the seriousness one would assume." Robert Morse, "U.S. News Urges Law School Deans to Improve Employment Data," *U.S. News & World Report*, March 9, 2011.   Acknowledging the obvious, Kelly concluded, "Perhaps we need metrics besides total employment rates to evaluate a successful law program." *Id.*

39.     The employment data provided to *US News* constitutes 18 percent (four percent for the employment rate upon graduation and 14 percent for the rate nine months after graduation) of a law school's ranking in *US News*, the second most important factor after a law school's peer assessment.

40.     According to the 2009 and 2010 NALP National Summary Reports, law schools must respond to the NALP questionnaire by specifically breaking down the exact type of employment their graduates have obtained, differentiating between part-time and full-time jobs or whether a position requires a JD degree.  *See* NALP Class of 2009 National Summary Report ("2009 NALP Employment Report") & NALP Class of 2010 National Summary Report ("2010 NALP Employment Report").

41.     In other words, WLS has been breaking down its employment data into various disaggregated categories, such as whether a is or part-time or JD preferred.  *See* 2010 Employment Survey (*see* Ex. 3).  Yet, rather than disclosing this data on its website and

marketing material it makes available to public at large, the school presented highly misleading data to prospective and current students that grossly inflate post-graduation employment rates and salary information while depicting an unrealistic, if not entirely inaccurate, picture of bountiful career prospects that do not exist.

42.     In reality, the employment data reported and marketed by WLS bears little resemblance to the actual experiences and dim employment opportunities encountered by their recent graduates.  Perhaps fewer than *40 percent* -- if not even fewer -- of recent WLS graduates secure full-time, permanent employment for which a JD degree is required or preferred within nine months of graduating, and that the majority of them work in either part-time or temporary positions.

43.     Indeed, there is no better proof that WLS manipulates its employment data than the fact that the school's placement rate remained eerily steady at 94 percent in 2008 and 2009 and 93 percent in 2010 following the aftermath of the "Great Recession," which wreaked havoc on the legal market, leading to thousands of mass layoffs.

44.     Moreover, an examination of the 2009 NALP Employment Report confirms the obvious -- *i.e.* that WLS manipulates employment data, and that substantially fewer than 90-plus percent of 2009 and 2010 graduates are gainfully employed.

45.     Still, even that number is subject to manipulation, since the NALP data is based on unaudited, unverified, self-reported information.  In actuality, if law schools were required to employ proper scientific methodologies to ascertain the true employment status of all of their graduates -- *i.e.* by actually speaking to each graduate instead of relying on self-reported data from those who actually supply it -- the employment number would be much lower.

46.     Moreover, upon information and belief, WLS tabulates, calculates and tallies the raw data inputted in the job surveys filled out by recent graduates in a shoddy, slipshod manner, choosing to omit or ignore critical statistical data that would substantially lower both placement rates and salary information reported both in its employment reports and distributed to third-party data clearinghouses.

47.     One must also bear in mind that the NALP employment number includes data supplied by all law schools, many of which are ranked higher and have considerably more prestige than WLS, which is currently ranked by *US News* in the bottom or fourth tier of all accredited and provisionally accredited law schools.   As such, logic dictates that WLS's true employment rate would be significantly below the statistical mean of the bell curve.

48.     Upon information and belief, WLS has also employed a limited program to further manipulate their employment numbers, by, among other things, hiring unemployed graduates as "research assistants" or other "make work" positions for a specified period of time, so as to classify them as "employed" in various employment surveys.   In some instances, upon information and belief, these internships begin in the ninth month following graduation, right before WLS would be required to report its employment data to the ABA, NALP and *US News*.

49.     WLS's manipulation of employment data is particularly troubling considering that its students are graduating in one of the grimmest legal job markets in decades.  Since 2008 alone, the largest 250 law firms in the country have eliminated 10,000 positions, while commoditized, legal-entry work such as document review is increasingly being outsourced to countries outside the US, such as India.   The entry-level employment offer rate for 2009 summer associates was at a historic low of 69 percent, as compared to 90 percent in 2008 and 93 percent in 2007.  Scores of law firms have cancelled summer programs, and in a recent survey 55 percent

of law schools reported a decrease of 30 percent or more of the number of firms doing on-campus interviews, an unprecedented decline.  In another survey, only 3 percent of on-campus recruiters indicated that they were looking to hire third-year law students, as compared to 25 percent in 2008 and 42 percent in 2007.

50.     At the same time WLS manipulates its data, its students are saddling themselves with tens of thousands of dollars in huge, non-dischargeable debt.  According to *US News*, WLS students graduate on average with a staggering *$111,909* in loans, placing them well within the top 30th percentile of indebtedness among all law school graduates, with a stunning 91 percent of them taking out loans to attend the school.[5]  Nationwide, the debt burden of law school graduates continues to rise unabated, and the average debt burden for all law school graduates is almost $100,000, up sharply from $16,000 in 1987.

51.     Worse yet, WLS is primarily marketing its product to naïve, relatively unsophisticated consumers -- many of whom are barely removed from college -- who are often making their first "big-ticket" purchase based on asymmetrical information.  These prospective students are applying to law school with one objective in mind: to attain the kind of job that provides compensation and a lifestyle that is commensurate with and worthy of the enormous time, money and personal sacrifice invested in a legal education.   However, if WLS was to

---

[5]According to FinAid.org, a graduate needs to make at least $138,000 annually to repay $100,000 without enduring financial hardship, or $92,000 annually to repay the debt with financial difficultly. *See* http://www.finaid.org.calculators/loanpayments/phtml.  According to a recently published paper by Jim Chen, the Dean of the University of Louisville Louis D. Brandeis School of Law, a student would have to earn three times a law school's annual tuition to make the investment of attending law school economically worthwhile.  Karen Sloan, "Law School, a Ticket to Economic Security? Better Run the Numbers," *The National Law Journal*, December 12, 2011; *see also* Jim Chen, "A Degree of Practical Wisdom: The Rate of Educational Debt to Income as a Basic Measurement of Law School Graduates' Economic Viability," William Mitchell Law Review, Vol. 38, 2012.  For example, for a student who attends a law school with an annual tuition of $40,000 -- i.e. the tuition at most private schools -- that would mean he would need to earn at least $120,000 to make the investment worthwhile.

disclose accurate employment data and the steep odds its graduates face in securing gainful employment, it would become abundantly clear to any rational purchaser how poor of an investment attending WLS actually is.

52.     Currently, WLS enrolls approximately 1,600 students, a number which has remained remarkably constant even since the onset of the "Great Recession".  Law schools awarded over 44,000 JD degrees in 2010, a more than 16 percent increase from 2002, while the number of students taking the law school entrance examination (LSAT) increased by over 20 percent between 2007 and 2009.  For the 2009-2010 academic year, a record 154,549 students enrolled in American law schools, including a record 51,426 first-year students, up by over 60 percent from the 91,225 students who enrolled in ABA accredited law schools in 1971.  The total number of law schools has increased by nine percent over the past decade and by over 25 percent over the past four decades, and, despite the ominous employment trends and dearth of available jobs, there are a handful of new law schools that are slated to open their doors in the next few years.  Allowing the *status quo* to persist will almost certainly ensure that tens of thousands of law school graduates -- a whole "lost" generation of lawyers -- will continue to be churned out over the next decade with little realistic chance of ever earning back their investment.[6]

53.     Fortunately, after much public hand-wringing and increased media scrutiny, the tectonic plates in the legal profession have finally begun to shift, as practitioners and politicians

---

[6] Finally, after years of steady growth, law school applications for the 2011-2012 academic year dropped by 10 percent. *See* Nathan Koppel, "Bloom's Off Law School Rope," Wall Street Journal Law Blog, September 28, 2011, http://blogs.wsj.com/law/2011/09/28/bloom-remains-off-law-school-rose/. Undoubtedly, this stems from the recent upsurge in media scrutiny on the inability of law school graduates to obtain gainful employment and the overall grim reality of one of the worst legal job market in decades.  *See e.g.* David Segal, "Is Law School a Losing Game?" *New York Times*, January 8, 2011.

alike are starting to roundly demand that law schools change their deceptive ways and accurately report all available employment information.

54.     Senator Barbara Boxer of California has sent three separate letters to the ABA taking them to task for failing to properly police the law school industry.   *See* Letters from Senator Barbara Boxer to Stephen Zack, dated March 31, 2011 & May 20, 2011 (attached as Ex. 5). In her May 20th letter, she directly implored the ABA to require that all law schools independently audit and verify employment data and salary information that are either included in marketing material to prospective students or disseminated to third-party information clearinghouses and publications, such as *US News* and the ABA.  In her third letter sent on October 6, 2011, she further admonished the organization for "resorting to half measures instead of tackling a major problem head on" despite the deafening public outcry for greater scrutiny in the way law schools disclose placement rates. *See* Letter from Senator Barbara Boxer to Wm. T. Robinson III, dated October 6, 2011 (attached as Ex. 6).  Senator Boxer has even reached across the aisle with her colleague Senator Tom Coburn of Oklahoma to ask the Department of Education to step in and investigate the law school industry for its systemic failure to properly disclose employment prospects to prospective and current students.   *See* Letter from Senator Barbara Boxer & Senator Tom Coburn to Kathleen Tighe, dated October 13, 2011 (attached as Ex. 7).

55.     Similarly, a coalition of 55 law school student body presidents have sent to Congress proposed legislation that would ensure "enhanced accuracy, accountability and transparency in the reporting of data pertaining to legal education." *See* Student Bar Association's Proposed Bill ("SBA Bill") and accompanying Press Release (attached as Ex. 8). Among other things, the proposed legislation creates a new standard for reporting employment

data, requires law schools to submit annual employment reports to the Department of Education, mandates that law school deans personally endorse such reports, and empowers the DOE to audit the reports.  The SBA Bill expressly aims to parallel federal securities laws, where publicly-held companies must submit annual reports to the SEC disclosing material financial information.

56.   The problem has gotten so out of hand that Bill Hebert, President of the California Bar Association, in a much publicized article in the California Bar Journal, exhorts law school deans to adopt more rigorous reporting standards by disclosing the type of detailed employment and salary data that would allow students to get a realistic picture of their post-graduate financial situation.  Bill Hebert, "What is the Value of the Law Degree?" California Bar Journal, February 2011(attached as Ex. 9).  Hebert chides schools for "hiding employment outcomes in aggregate statistical forms," and impresses upon them the need to reveal the exact percentage of their graduates who have actually obtained full-time, permanent employment -- the type of information Plaintiffs are now seeking.  *Id*.

57.   Along these lines, Howard B. Miller, the previous President of the California Bar, went so far as to all but accuse law schools of committing fraud in the way they tabulate and report employment information to third party data clearinghouses like the ABA and *U.S. News*.  Specifically, he wrote in the California Bar Journal: "There is notoriously unreliable self-reporting by law schools and their graduates of employment statistics. They are unreliable in only one direction, since the self reporting by law schools of 'employment' of graduates at graduation and then nine months after graduation are, together, a significant factor in the U.S. News rankings -- which are obsessed over, despite denials, by law schools and their constituencies. The anecdotes are as telling as the statistics: prestigious lawyers in the state are hiring their own children to work in their firms because even with their connections they were

unable to find employment elsewhere."

58.     The ABA's Section of Legal Education and Admissions to the Bar is responsible for accrediting and regulating all accredited legal institutions.   In general, the ABA has absolutely no mechanism by which to address Plaintiffs' claims, since law school students and graduates are strictly prohibited from bringing such claims before the organization.  Indeed, Rule 24 of the ABA Standards for Approval of Law Schools expressly states:

> This process is not available to serve as a mediating or dispute-resolving process for persons with complaints about the policies or actions of an approved law school. The Council, Accreditation Committee and the Consultant on Legal Education will not intervene with an approved law school on behalf of an individual with a complaint against or concern about action taken by a law school that adversely affects that individual. The outcome of this process will not be the ordering of any individual relief for any person or specific action by a law school with respect to any individual.

(Emphasis added). [8]

59.     The ABA's Legal Education Council is dominated by law school deans, as both its current chair, John O'Brien of the New England School of Law, and chair-elect, Kent Syverud of the Washington University School of Law, are deans of large, prominent law schools. Likewise, the committee of the Legal Education Council which is directly responsible for regulating the reporting of post-graduate placement data – i.e. the Questionnaire Committee – is dominated by law school deans and professors, including its current chair Dean Art Guadio of the Western New England College School of Law.  *See generally* Ex. 10 p. 2 (noting that legal academics and university presidents and vice presidents comprise approximately 48, 52 and 64 percent of the three accreditation-related committees).

---

[8] Similarly, Plaintiffs cannot seek redress from the Department of Education, which administers Federal financial assistance to students, since the DOE only authorizes suits against the Secretary of Education, not against individual schools.  *See* 20 U.S.C. § 1082(a)(2).

60.      The undue influence exerted by the legal academy over the ABA has led the National Advisory Committee on Institutional Quality and Integrity, which advises the Department of Education on accreditation issues, to question the ABA's overall competency as an accrediting body.  Specifically, the committee found that the ABA had failed to comply with 17 regulations, including, among others, failing "to set a standard for job placement by its member institutions." *See* http://taxprof.typepad.com/taxprof_blog/2011/06/aba-is.html.  One of the members on the committee, Arthur Keiser, publicly accused the ABA of "not getting it," noting that an accrediting agency would never accredit an institution with 17 outstanding issues. *Id*; *see also* Ex. 11 at p.1  (quoting June 11, 2011 article from *The Chronicle of Higher Education* which describes the committee's members as expressing "frustration that they could not take stronger actions or at least state their concerns [regarding the ABA's lackluster accreditation process] with stronger language.")

## CLASS ACTION ALLEGATIONS

61.      This action is brought and may properly be maintained as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rule of Civil Procedure.  Plaintiffs bring this action, on behalf of themselves and all other similarly situated, as representative members of the following proposed class (the "Class"):

> All persons who are either presently enrolled or graduated from the Widener University School of Law within the statutory period for the six-year period prior to the date this Complaint is filed through the date that this Class is certified.

62.      Excluded from the Class are Defendants, WLS, its employees, officers and directors, the Judge(s) assigned to this case, and the attorneys of record in this case.  Plaintiffs

reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

63.     For the foregoing reasons, this action fulfills the standards and requirements as outlined in Rule 23(b)(2) and (b)(3) of the Federal Rule of Civil Procedure:

**A.      The Parties are Numerous and Easily Ascertainable**

64.     The proposed Class is so numerous that it is manifestly impracticable to bring them all before the court.  Though the exact number and identities of the Class members is unknown at this time, they likely number hundreds of people, because around 500 students graduate from WLS each year.  The number and identities of the Class members may be ascertained from Defendants' records and files, and may easily be notified about the pendency of this action through individually mailed notice and/or notice by publication.

**B.      Common Questions of Law and Facts Predominate**

65.     This action presents questions of law and facts common to the Class, including, but not limited to, the following:

a.      Whether Defendants represented that approximately 90-95 percent of their graduates secure employment within nine months of graduation;

b.      Whether Defendants represented salary information without disclosing the percentage of students reporting salary information;

c.      Whether Defendants engaged in deceptive, misleading, unfair, fraudulent and/or otherwise unlawful practices through its non-disclosure of material facts and affirmative misleading statements regarding post-graduate employment data and salary information;

d.      Whether Defendants' conduct violated Delaware's Deceptive Trade Practices Act as alleged herein;

e.      Whether Plaintiffs and Class members are entitled to recover actual damages as a result of the actions alleged herein;

f.      Whether Plaintiffs and members of the Class are entitled to recover restitution of tuition monies remitted to Defendants as a result of the actions alleged herein;

g.      Whether Plaintiffs and Class members of the Class are entitled to recover punitive damages as a result of the actions alleged herein;

h.      Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest and costs of this suit;

i.      Whether Defendants should be forced to retain independent, non-related third-parties to audit and verify their post-graduate employment data and salary information;

j.      Whether Defendants should be enjoined from continuing to make false and misleading representations and omissions regarding their post-graduate employment data and salary information; and

k.      Whether Plaintiffs and Class members paid inflated tuition based on material misleading statements, representations and omissions.

**C.      Plaintiffs' Claims Are Typical of the Class**

66.      Plaintiffs' claims are typical of the claims and of the members of the Class because they have all been damaged in the same manner and way as a result of Defendants' failure to disclose material facts and policies of misrepresentation and omissions.  Accordingly, the interests of the representative Plaintiffs are co-extensive with the interests of each Class member, and all have a common right of recovery based upon the same facts.

**D.    The Class Representatives Can Adequately Represent the Class**

67.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, in that they have no interests that are antagonistic to or that irreconcilably conflict with those of other Class members, Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation, including substantial experience in the types of claims alleged herein.

**E.    A Class Action Is Superior To All Other Available Methods For The Fair And Efficient Adjudication Of Plaintiffs' and Class Members' Claims**

68.    A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiffs' and Class Members' claims.  A class action is superior to preserve Class Members' claims who would otherwise forego litigation given the burden and expense of individual prosecution of their claims, in comparison to the amount of damages suffered by each individual Class Member.  Individualized litigation would burden the courts, would increase the delay and expense to all parties and the Court, and would produce the potential for inconsistent or contradictory judgments and would establish incompatible standards of conduct for Defendants.  The individual prosecution of separate actions would create a risk of adjudications which may be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Furthermore, final injunctive relief is appropriate against Defendants with respect to members of a Class as a whole, as opposed to individual injunctions.  Certification of a class action to resolve these disputes will reduce the possibility of repetitious litigation involving hundreds of thousands of Class members, and allow supervision by a single court.

69.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for an order certifying the Class and appointing Plaintiffs and their counsel of record to represent the Class.

### FIRST CAUSE OF ACTION

**(Against All Defendants for Violations of
Delaware's Deceptive Trade Practices Act,
6 Del. C. §§2531-36 *et seq*)**

70.     Plaintiffs incorporate by reference each and every allegation set forth above as if fully stated herein.

71.     Defendants' actions constitute unlawful, unfair, deceptive and fraudulent practices as defined by Delaware's Deceptive Trade Practices Act, 6 Del. C. §§2531-36 *et seq*.

72.      As part of its fraudulent marketing practices and recruitment program, WLS engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class.  These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a.     Stating false placement rates during the recruitment and retention process, including that approximately 90-95 percent of WLS graduates secured employment within nine months of graduation;

b.     Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a JD degree is required or preferred;

c.      Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

d.      Making deceptive and misleading statements, representations and omissions concerning WLS's reputation with potential employers;

e.      Making deceptive and misleading statements, representations and omissions concerning the value of a WLS degree;

f.      Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field; and

g.      Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically that approximately 90-95 percent of WLS graduates secure gainful employment.

73.     In general, Plaintiffs and members of the Class enrolled at WLS for the purpose of securing upon graduation full-time, permanent employment for which a JD degree is required or preferred.  Defendants' acts, practices and omissions, therefore, were material to Plaintiffs' decision to enroll and attend WLS, and further proximately caused Plaintiffs and other members of the Class to pay inflated tuition.

74.     The Defendants' above-alleged actions constitute unfair business practices since the actions were deceptive, immoral, unethical, oppressive, unscrupulous, substantially injurious, and operate to the competitive disadvantage of other law schools.  They are also likely to deceive the public.  Moreover, the injury to the Plaintiffs was substantial and outweighs the utility of the Defendants' practices.

75.     The unfair and deceptive trade acts and practices have directly, foreseeably and proximately caused damage to Plaintiffs and other members of the Class.

76.     The Defendants' practices, in addition, are unfair and deceptive because they have caused Plaintiffs and the Class substantial harm, which is not outweighed by any countervailing benefits to consumers or competition, and is not an injury consumers themselves could have reasonably avoided.

77.     The Defendants' acts and practices have misled and deceived the general public in the past, and will continue to mislead and deceive the general public into the future, by, among other things, causing them to apply to and enroll at WLS under false pretenses.

78.     Plaintiffs are entitled to preliminary and permanent injunctive relief ordering the Defendants to immediately cease these unfair business practices, as well as disgorgement and restitution to Plaintiffs of all revenue associated with their unfair practices, or such revenues as the Court may find equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, pray for relief and judgment against Defendants WLS and Does 1 though 20 as follows:

1. For preliminary and injunctive relief enjoining Defendants, their agents, servants, employees and all persons acting in concert with them from continuing to engage in their unlawful recruitment program and manipulation of post-graduate employment data and salary information, and all other unfair, unlawful and /or fraudulent business practices alleged above and that may yet be discovered in the prosecution of this action;

2. For certification of the Class;

3.  For the partial restitution and disgorgement of tuition monies remitted to WLS, totaling $75 million, which is the difference between the inflated tuition paid by Class members based on the material misrepresentations that approximately 90-95 percent of graduates are employed within nine months of graduation and the true value of a WLS degree;

4.  For damages;

5.  For punitive damages;

6.  For an accounting by Defendants for any and all profits derived by them from the herein-alleged unlawful, unfair, and/or fraudulent conduct and/or business practices;

7.  For injunctive relief ordering that WLS retains unrelated, independent third-parties to audit and verify post-graduate employment data and salary information;

8.  For attorneys' fees and expenses pursuant to all applicable laws;

9.   For prejudgment interest; and

10.  For such other and further relief as the Court may deem just and proper.

DATED: February 1, 2012                        Respectfully Submitted,

                                               **STONE & MAGNANINI LLP**


                                               By: /s/ David S. Stone
                                                     David S. Stone
                                                     Eric H. Jaso
                                                     Jason C. Spiro
                                                     **Stone & Magnanini LLP**
                                                     150 JFK Parkway,
                                                     Short Hills, NJ 07078
                                                     Phone (973) 218-1111
                                                     Facsimile (973) 218-1106

David Anziska
**The Law Offices of David Anziska**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437

Jesse Strauss
**Strauss Law, PLLC**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437

*Counsel for Plaintiffs, individually
and for all others similarly situated*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial on all causes of action so triable.

DATED: February 1, 2012

Respectfully Submitted,

**STONE MAGNANINI LLP**

By: <u>/s/ David S. Stone</u>
    David S. Stone
    Eric H. Jaso
    Jason C. Spiro
    **Stone & Magnanini LLP**
    150 JFK Parkway,
    Short Hills, NJ 07078
    Phone (973) 218-1111
    Facsimile (973) 218-1106

    David Anziska
    **The Law Offices of David Anziska**
    305 Broadway, 9th Fl.
    New York, NY 10007
    Phone (212) 822-1496
    Facsimile (212) 822-1437

Jesse Strauss
**Strauss Law PLLC**
305 Broadway, 9th Fl.
New York, NY 10007
Phone (212) 822-1496
Facsimile (212) 822-1437


*Counsel for Plaintiffs, individually
and for all others similarly situated*