**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHN HARNISH, JUSTIN SCHLUTH, ROBERT KLEIN, ROBERT MACFADYEN, GREGORY EDMOND, AYLA O'BRIEN KRAVITZ, MEGAN SHAFRANSKI, CHRISTINA MARINAKIS, on behalf of themselves and all others similarly situated, | : : : : : : : : | **OPINION**  Civ. No. 2:12-cv-00608 (WHW) |
| Plaintiffs, | : : | |
| v. | : : | |
| WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-10, | : | |
| Defendants. | | |

**Walls, Senior District Judge**

Defendant The Delaware Law School of Widener University, Inc. ("Widener") moves for dismissal of Plaintiffs' Amended Class Action Complaint ("Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' Amended Complaint alleges Widener posted to its website, and disseminated to third-party law school evaluators, misleading and incomplete graduate employment rates in violation of New Jersey and Delaware Consumer Fraud Acts. The Court decides and denies this motion without oral argument under Federal Rule of Civil Procedure 78(b).

### FACTUAL AND PROCEDURAL BACKGROUND

FOR PUBLICATION

Widener Law School is an American Bar Association ("ABA") accredited law school based in Wilmington, Delaware, with a satellite campus in Harrisburg, Pennsylvania. Am. Compl. ¶ 27. Widener's student admittance policies are among the least discriminating in the country and its acceptance rates are among the highest. *Id*. ¶¶ 27, 31.  Its class sizes are large – each year Widener enrolls approximately 1,600 students. *Id*. But not all enrolled students graduate. In 2008, 23 percent of the first year students failed to matriculate in their second year. *Id*. ¶ 31.  Plaintiffs themselves describe Widener as a "lower tier" law school. *Id*. ¶ 48.

In the 2010-2011 academic year, Widener's tuition was $34,890 and room and board was approximately $20,000. *Id.* ¶ 32. The annual cost of attending Widener was approximately $55,000 per year, for a total of $165,000 over three years. *Id*. The average Widener law student graduates with $111,909 in debt. *Id.* ¶ 43.

Plaintiffs[1] are eight Widener Law School alumni who graduated between 2008 and 2011. *Id*. ¶ 1. To some degree or other, Plaintiffs claim completion of their Widener law degree did not result in satisfactory legal employment. As example, Plaintiff Justin Schluth is currently unemployed. *Id.* ¶ 18. Plaintiff Robert Klein works in a non-legal position with the federal government but "could not find a permanent position in the legal industry." *Id.* ¶ 20. Plaintiff Megan E. Shafranski found employment as a Chancery Judge Clerk, then "had difficulty finding full-time legal employment," but is now an attorney. She alleges her "salary . . . is not adequate to cover her debt obligations." *Id.* ¶ 23. Plaintiffs assert that "[a]ccording to FinAid.org, a

---

[1] Class representatives include: John Harnish, WLS Class of 2009, Justin Schluth, WLS Class of 2010, Robert Klein, WLS Class of 2009, Robert MacFayden, WLS Class of 2008, Gregory Edmond, WLS Class of 2011, Megan E. Shafranski, WLS Class of 2008, Ayla O'Brien, WLS Class of 2008, and Christina Marinakis, WLS Class of 2010. Plaintiff Edward Gilson, WLS Class of 2009, withdrew from the litigation on June 11, 2012. ECF No. 19.

**FOR PUBLICATION**

graduate needs to make at least $138,000 annually to repay $100,000 without enduring financial hardship, or $92,000 annually to repay the debt with financial difficulty." *Id.* ¶ 23 n. 1.

Under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), Plaintiffs filed an Amended Class Complaint, on behalf of themselves and those similarly situated, that generally alleges "common law fraud and related claims" against Widener. *Id.* ¶¶ 1, 14. The class consists of "[a]ll persons who are either presently enrolled or graduated from the Widener University School of Law within the statutory period for the six-year period prior to the date the Complaint in this action was filed through the date that this Class is certified." *Id.* ¶ 5.

The crux of Plaintiffs' claims arises from Widener's marketing materials and reporting practices between 2005 and 2011. At an unspecified time, Widener's website stated "[a]s a graduate of Widener Law, you'll join a network of more than 12,000 alumni in 50 states, the District of Columbia, and 15 countries and territories who are using their Widener Law degrees to pursue successful, rewarding careers." *Id.* ¶ 3. And over the years, on its website page entitled "Employment Statistics and Trends," *Id.* Ex. B, Widener updated its employment information as follows:

   a. "Graduates of the Class of 2004 had a 90% employment rate within nine months of graduation."

   b. "Graduates of the Class of 2005 had a 90% employment rate within nine months of graduation."

   c. "Graduates of the Class of 2007 had a 96% employment advanced degree rate within nine months of graduation."

   d. "Employment within nine months of graduation of over 91% for Class of 2008."

   e. "Employment within nine months of graduation of over 92% for Class of 2009."

**FOR PUBLICATION**

      f.   "Graduates of the Class of 2010 had a 93% employment/advanced degree rate within nine months of graduation."

*Id*. ¶ 35

To accumulate this employment data, Widener conducted surveys of its alumni. *Id*. ¶ 5. As example, in 2011, the survey inquired whether an alumnus was seeking work, his employment status, and if employed, whether the position was full-time or part-time, temporary or permanent, whether the job required a bar admission, or was J.D. preferred, and other questions regarding the specific type of law practiced. *Id.* Ex. A.

Plaintiffs claim that the employment statistics reported on Widener's website were misleading because Widener "did not disclose that its placement rate included full and part time legal, law-related and non-legal positions" and that "a graduate could be working in *any* capacity in *any* kind of job, no matter how unrelated to law – and would be deemed employed and working in a career 'using' the WLS law degree." *Id.* ¶¶ 36-37 (emphasis in original). Specifically, Plaintiffs allege the statistics were misleading because Widener "did not disclose that when a graduate responded, 'not seeking work,' WLS simply did not count the graduate"; that Widener "would count as 'employed' a graduate who was only employed for a short period of time before the survey, but was likely unemployed"; that Widener would "count as 'employed' graduates who, out of desperation, had started their own solo law practice without first confirming whether the graduate had obtained licensure in the jurisdiction"; and that Widener "did not disclose that a sizeable percentage of WLS graduates did not respond to the survey." *Id.* ¶ 36. In sum, Widener published and reported an aggregate employment rate but did not disclose the disaggregated data that it used to compile its rate.

**FOR PUBLICATION**

In 2011, Widener modified its website to share more specific employment data. It now reads:

> Graduates of the Class of 2010 had a 93% employment / advanced degree program participation rate. This rate includes full and part time legal, law-related and non-legal positions as well as advanced degree program participation within nine months of graduation. For more information, please download a comprehensive summary of employment statistics (PDF).

*Id.* ¶ 47.

Plaintiffs additionally claim Widener misled students by "reporting its misleading placement rates and salary statistics to third parties such as *U.S. News* and the ABA." *Id.* ¶ 38. Plaintiffs allege Widener alone had "in its possession the information required to provide students with complete and accurate information about its job placement track record." *Id.* ¶ 34. The ABA reported employment rates for Widener as 86 percent for 2005, 82 percent for 2006, 84 percent for 2007, 90 percent for 2008 and 90 percent for 2009. *Id.* ¶ 38. *U.S. News* reported employment rates for Widener as 83 percent for 2006, 88.5 percent for 2007, 91 percent for 2008, and 78 percent for 2009. *Id.* ¶ 39.

Plaintiffs deduce Widener's employment statistics "helped to artificially boost WLS's *U.S. News* ranking because this data constitutes 18 percent . . . of a law school's ranking." *Id.* ¶ 39. Plaintiffs explain this reporting was especially detrimental since "prospective law students rely upon" the *U.S. News* rankings to make their law school decisions. *Id.* ¶ 40.

Plaintiffs failed to assert any common law fraud causes of action, and have voluntarily dismissed their first cause of action alleging violations of Delaware's Deceptive Trade Practices Act, 6 Del. C. §§ 2531-36, *et seq.* ECF No. 22. Remaining before this Court are Plaintiffs'

**FOR PUBLICATION**

second and third causes of action which allege Widener "engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class" in violation of New Jersey and Delaware Consumer Fraud Acts.  Am. Compl. ¶¶ 75; 90.  These charges are identically pled with the exception of their specific application to the Delaware and New Jersey laws. Plaintiffs claim Widener violated the New Jersey and Delaware's Consumer Fraud Acts by making the following "false representations and omissions":

    a.    Stating false placement rates during the recruitment and retention process, including that approximately 90-95 percent of WLS graduates secured employment within nine months of graduation;

    b.    Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a J.D. is required or preferred;

    c.    Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

    d.    Making deceptive and misleading statements, representations and omissions concerning WLS's reputation with potential employers;

    e.    Making deceptive and misleading statements, representations and omissions concerning the value of a WLS degree;

    f.    Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field; and

    g.    Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically that approximately 90-95 percent of WLS graduates secure gainful employment.

*Id.*

FOR PUBLICATION

Plaintiffs seek injunctive relief of "fraudulent and deceptive business practices" as well as compensation through "disgorgement and restitution . . . totaling $75 million, which is the difference between the inflated tuition paid by Class members based on the material representations that approximately 90-95 percent of graduates are employed within nine months of graduation and the true value of a WLS degree."  Pr. For Rel. ¶¶ 1, 3. Plaintiffs also request damages, punitive damages, prejudgment interest, treble damages, attorneys' fees, and costs under N.J. Stat. Ann § 56:8-10. *Id.*; Am. Compl. ¶¶ 97-99.  Finally, Plaintiffs seek civil penalties of $10,000 for violations of the Delaware and New Jersey Consumer Fraud Acts that may have affected elderly or disabled persons in violation of 6 Del. C. §§ 2580 *et. seq.* and N.J. Stat. Ann. § 56:8-14.3. Am. Compl. ¶¶ 84, 99.

## STANDARD OF REVIEW

In deciding Defendants' motion to dismiss, the Court must look to the face of the complaint and decide, taking all of the allegations of fact as true and construing them in the light most favorable to Plaintiffs, whether the Amended Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). A plaintiff is obligated to "provide the 'grounds' of his 'entitle[ment] to relief,'" which requires more than "labels and conclusions," but he is not required to lay out "detailed factual allegations." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint must contain facially plausible claims, that is, a plaintiff must "plead[] factual content [that] allows the court to draw the

FOR PUBLICATION

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

663 (quoting *Twombly*, 550 U.S. at 556).

To the extent that Plaintiffs claim fraud or misrepresentation, they "must state with

particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The pleading

requirements of Rule 9(b) apply to . . . NJCFA claims as well as . . . common law fraud claims."

*Slim CD, Inc. v. Heartland Payment Sys.*, No. 06-2256, 2007 WL 2459349, at *11 (D.N.J. Aug.

22, 2007) (citing *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994)). Under Rule 9(b), a

plaintiff must describe the alleged fraud with sufficient particularity to place the defendant on

notice of the "precise misconduct with which they are charged." *Seville Indus. Machinery Corp.*

*v. Southmost Machinery Corp.*, 752 F.2d 786, 791 (3d Cir. 1984). The plaintiff must plead or

allege the date, time and place of the alleged fraud or otherwise inject some measure of

substantiation into a fraud allegation. *Id.*

## DISCUSSION

The New Jersey Consumer Fraud Act and the Delaware Consumer Fraud Act are

substantially similar, but this Court will consider each in turn.

### A.  The New Jersey Consumer Fraud Act

The New Jersey Consumer Fraud Act ("NJCFA") was intended to be one of the strongest

in the country. Press Release, Governor William T. Cahill, Assembly Bill No. 2402, at 1 (June

29, 1971); *see generally Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 603 (N.J. 1997). It was

designed to address "sharp practices and dealings in the marketing of merchandise and real estate

whereby the consumer could be victimized by being lured into a purchase through fraudulent,

**FOR PUBLICATION**

deceptive or other similar kind of selling or advertising practices." *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 271 (N.J. 1978). At all times, as "remedial legislation," the NJCFA "should be construed liberally." *Int'l Union of Operating Engineers Local No. 68 Welfare Fund ("IUOEL 68") v. Merck & Co.*, 192 N.J. 372, 377 n.1 (N.J. 2007) (collecting cases).

The NJCFA states:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann. § 56:8-2.

To state a claim under the Act, Plaintiffs must allege sufficient facts to demonstrate: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *IUOEL 68*, 192 N.J. at 389 (internal citations omitted).

### 1. Unlawful Conduct

Unlawful conduct falls into three general categories: affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. §§ 56:8–2, 56:8–4. *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (N.J. 1994).[2] This Court considers each of Plaintiffs' claims in turn.

---

[2] Widener argues Plaintiffs' allegations only amount to "knowing omissions" under the NJCFA. Mot. to Dismiss 17-29. And Plaintiffs' failure to provide disaggregated data from the statements

**FOR PUBLICATION**

### a. Affirmative Acts

Under the NJCFA, affirmative acts must be "'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer." *New Jersey Citizen Action v. Schering-Plough Corp.*, 376 N.J. Super. 8, 13 (N.J. Super. Ct. App. Div. 2003) (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 429 (N.J. 1995), *cert. denied*, 516 U.S. 1066 (1996)). "Often, the determination of whether business conduct 'stand[s] outside the norm of reasonable business practice' presents a jury question." *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 514 (D.N.J. 2009) *aff'd*, 374 Fed. Appx. 341 (3d Cir. 2010) (quoting *Turf*, 133 N.J. at 416). But courts have dismissed NJCFA complaints for failure to state a claim "where plaintiffs have failed to allege that the defendant engaged [in] conduct that could be considered misleading within the meaning of the Act." *Hassler*, 644 F. Supp. 2d at 514-15 (collecting cases).

Plaintiffs allege Widener "stat[ed] false placement rates" and "disseminat[ed] false post-graduate employment data and salary information." Am. Compl. ¶¶ 75, 90. These allegations are unsupported by specific facts. Yet, even though such claims of Defendant may not have been

---

on their website and to third party law school evaluators can be considered an omission. But Plaintiffs' Amended Complaint also contains allegations of affirmative acts. Plaintiffs allege Widener "stat[ed] false placement rates" and "disseminat[ed] false post-graduate employment data and salary information to various third-party data clearinghouses and publications" which are allegations of fraud. Am. Compl. ¶¶ 75, 90. The Amended Complaint also charges Widener with "manipulating post-graduate employment data, *so as to give the appearance* that the overwhelming majority of recent graduates secure full-time, permanent employment for which a J.D. is required or preferred"; "making *deceptive and misleading statements*, [and] representations . . . concerning WLS's reputation with potential employers . . . . concerning the value of a Widener law degree. . . . [and] concerning the rate at which recent graduates can obtain gainful employment in their chosen field"; and "caus[ing] students to pay inflated tuition based on *materially misleading statements, [and] representations* . . . including, specifically that approximately 90-95 percent of WLS graduates secure gainful employment" which are allegations of deception and misrepresentation. *Id.* (emphasis added).

**FOR PUBLICATION**

false, Plaintiffs' allegations of deception and misinterpretation are still plausible. The NJCFA recognizes "the fact that the [advertisements are] literally true does not mean they cannot be misleading to the average consumer." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 98-99 (D.N.J. 2011) (finding a comparison between low-sodium tomato soup labels and "our regular product" to be potentially misleading when, the comparison was true if drawn between an old formulation of regular tomato soup or to an average of condensed soup, but untrue when compared to the tomato soup available for sale at the time). *See also Miller v. American Family Publishers*, 284 N.J. Super. 67, 76 (N.J. Super. Ct. Ch. Div. 1995) (finding a magazine created the misleading impression that a magazine subscription would help one's chance of winning a sweepstakes when it urged its consumers to quickly return a subscription even though "Defendant [was] correct that a careful, literal reading of the quoted language reveals that the words do not actually say what plaintiffs claim they are intended to convey").

Widener charges top prices for a Widener education. Am. Compl. ¶ 32. The cost of a Widener education is over $150,000 and the average Widener student graduates with over $110,000 in nondischargeable debt. *Id.* ¶ 43. To encourage prospective students to attend Widener, Widener's website has a page, updated yearly, entitled "Employment Statistics and Trends."

Contained upon that page are four headings: Judicial Clerkships, Class of [Year] Profile, Full Time Legal Employers, Employer Locations, and Related Links. *Id.* Ex. B. Sandwiched between "Judicial Clerkships" and "Full Time Legal Employers" – forms of legal employment – is the class "profile" which contains the disputed statements. For example, the "Class of 2004 Profile" stated "Graduates of the Class of 2004 had a 90% employment rate within nine months

**FOR PUBLICATION**

of graduation."[3] Plaintiffs allege that over the years the statements, as posted on Widener's website and disseminated to third party evaluators, of an "employment rate" between 90-95 percent misled prospective law students into believing that rate refers to legal employment. Am. Compl. ¶ 36

Under somewhat similar facts about a different law school, two New York Supreme Courts, and a New York Appellate Court affirmance, concluded that no reasonable person could be misled to believe a statement referring to an employment rate refers to legal employment only. *Gomez-Jimenez, et. al v. New York Law School*, 943 N.Y.S.2d 834 (N.Y. Sup. Ct. 2012), *aff'd*, 956 N.Y.S.2d 54, 59 (N.Y. App. Div. 2012) (despite being "troubled by the unquestionably less than candid and incomplete nature of defendant's disclosures" the Appellate court nevertheless concluded, the "disclosures were not materially deceptive or misleading."); *Austin v. Albany Law School of Union Univ.*, 957 N.Y.S.2d 833, 840-843 (N.Y. Sup. Ct. 2013) (concluding under New York's consumer fraud law that as applied to "reasonably well-educated (though not necessarily sophisticated) . . . consumers", "ALS's publication of aggregated 'employment rates' cannot be considered deceptive or misleading"). This Court disagrees. Perception is often affected by location of the object. Here, we have data displayed above the category of "Full Time Legal Employers." Why should a reasonable student looking to go to law

---

[3] Widener briefly argues that because the Classes of 2007 and 2010 profiles included "advanced degree" students, it was unreasonable for students to infer that the employment rate referred only to legal employment. Mot. to Dismiss 15-16 (The Class of 2007 profile stated: "Graduates of the Class of 2007 had a 96% employment advanced degree rate within nine months of graduation." The Class of 2010 profile stated: "Graduates of the Class of 2010 had a 93% employment/advanced degree rate within nine months of graduation."). This argument plainly fails. Widener's conclusion ignores the Student Profiles for 2004, 2005, 2006, 2008, and 2009. And simply because Widener added advanced degree rates to the statistic, does not speak to Plaintiffs' claim that the "employment rate" inferred law-related employment, not general employment.

**FOR PUBLICATION**

school consider that data to include non law-related and part-time employment? Should that student think that going to Widener Law School would open employment as a public school teacher, full or part-time, or an administrative assistant, or a sales clerk, or a medical assistant?

The study of law is the learning of a profession. Widener's website promotes a professional school. Its function is to persuade a prospective law student to attend Widener in order to receive a degree in law. The employment rate was disseminated to third-party evaluators to establish Widener's standing among law schools. Within this context, it is not implausible that a prospective law student making the choice of whether or which law school to attend, would believe that the employment rate referred to law related employment. *See Hallock v. University of San Francisco*, No. CGC-12-517861, at *2 (Cal. Super. Ct. July 19, 2012) ("[T]here is nothing before me to suggest that any of the plaintiffs were not reasonable consumers of a law school education. Moreover, the statements attributed to defendant were allegedly made in a context (i.e. in materials designed to attract and retain law students to defendant's law school) where a reasonable prospective or current law student could reasonably believe that the statements pertained only to jobs for which a law school education is a requirement or preference and did not include jobs for which a law school education is irrelevant or of minimal utility. This issue . . . must await factual development by the parties.")

A Michigan District Court considering a similar case brought against a different law school concluded, "'basic deductive reasoning,' informs a reasonable person that the employment statistic includes all employed graduates, not just those who obtained or started full-time legal positions." *MacDonald v. Thomas M. Cooley Law Sch.*, 880 F. Supp. 2d 785, 792 (W.D. Mich. 2012). This Court disagrees. And there, Plaintiffs' Michigan Consumer Protection Act ("MCPA") claims were dismissed because in Michigan, "if an item is purchased primarily

**FOR PUBLICATION**

for business or commercial rather than personal purposes, the MCPA does not supply protection." *Id.* (quoting *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. Ct. App. 1999)). The Michigan District Court concluded that since "Plaintiffs purchased a legal education in order to make money as lawyers . . . . [t]his is a business purpose." *Id.*

Unlike the MCPA, the NJCFA does not distinguish between personal and business purposes, and New Jersey courts have upheld NJCFA claims for purchases intended for business use. *See, e.g., Coastal Group, Inc. v. Dryvit Syst., Inc.*, 274 N.J. Super. 171, 179-80 (N.J. Super. Ct. App. Div. 1994) (denying summary judgment for NJCFA claim relating to the purchase of prefabricated wall panels for business use by a condominium developer); *Hundred East Credit Corp. v. Eric Shuster Corp., et. al.*, 212 N.J. Super. 350, 355-57 (N.J. Super. Ct. App. Div. 1986) (NJCFA applied to claims related to purchase of computer parts for business use). This Court notes that professional services, such as attorney's services, are not actionable under the NJCFA. *Vort v. Hollander*, 257 N.J. Super. 56, 62 (N.J. Super. Ct. App. Div. 1992) ("attorney's services do not fall within the intendment of the Consumer Fraud Act.") Here, Plaintiffs made a purchase from The Delaware Law School of Widener University, Inc., an enterprise in the business of providing a legal education. Widener was not providing legal counsel to Plaintiffs; Widener was charging significant sums to teach Plaintiffs the practice of law. Such a claim is actionable under the NJCFA.

This case is also distinct from the Michigan case because the Michigan District Court's conclusion was drawn in the context of determining whether the standards of common law fraud were met. Allegations of fraud require reliance, and the District Court determined the Plaintiffs' deductions were unreasonable in part because "[t]here can be no fraud where a person has the means to determine that a representation is not true." *MacDonald*, 880 F. Supp. 2d at 794

**FOR PUBLICATION**

(quoting *Aron Alan*, 240 Fed. Appx. 678, 682 (6th Cir. 2007)). Indeed, there was a wealth of information outside the Widener website that would have indicated that the employment rate portrayed by Widener referred to an aggregate employment statistic. As example, every year NALP "surveys the graduating JD class . . . to learn about the employment experiences of new law graduates" and publishes this data on their website under a "Recent Graduates" tab.[4] These resources explain the national legal market, and provide employment data and average salary rates.[5]

Despite these statistics, "[u]nlike other states that require plaintiff to prove reliance under their consumer protection statutes, the proof requirements that the New Jersey statute places on its claimants is less burdensome*." Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 365 N.J. Super. 520, 540-541 (N.J. Super. Ct. Law Div. 2003). "The causes of action differ . . . in that common law fraud requires proof of reliance while consumer fraud requires only proof of a causal nexus between the concealment of the material fact and the loss." *Id.* (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607-608 (N.J. 1997)).

---

[4]   NALP, *Research and Statistics*, *Recent Graduates* (last visited Jan. 12, 2013), http://www.nalp.org/recentgraduates.

[5] In employment reports made available since 1999, NALP published an aggregate employment rate (which, during the period of 2004 to 2011, hit a low of 85.6% and a high of 91.9%) alongside specifically legal employment rates (which, during the period of 2004 to 2011, hit a low of 65.4% and a high of 76.9%). In each report, NALP cautions potential law students against unreasonable salary expectations. As example, even in 2006 when "the employment market for new law graduates . . . remained relatively strong" NALP warned "not . . . every new graduate started work at a large firm at one of the much publicized $135,000 or $145,000 salaries . . . . [f]ar more, 42% [made] $55,000 or less." NALP, *Class of 2011 Has Lowest Employment Rate Since Class of 1994*, *Recent Graduates* (last visited Jan. 12, 2013) http://www.nalp.org/0712research; NALP, *Market for New Law Graduates Up- Topping 90% For First Time Since 2007*, *Recent Graduates* (last visited Jan. 12, 2013) http://www.nalp.org/marketfornewlawgraduatesup.

**FOR PUBLICATION**

The NJCFA is "aimed at more than the stereotypic con man." *Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 471 (N.J. Super. Ct. App. Div. 2001). It is intended to "promote the disclosure of relevant information to enable the consumer to make intelligent decisions." *Id.* (quoting *Division of Consumer Affairs v. G.E. Co.*, 244 N.J. Super. 349, 353 (N.J. Super. Ct. App. Div. 1990)). Under the Act "[a] practice can be unlawful even if no person was in fact misled or deceived thereby." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (N.J. 1994) (internal citations omitted).

Here, an employment rate upwards of 90 percent plausibly gave false assurance to prospective students regarding their legal employment opportunities upon investment in and attainment of a Widener degree. While the thread of plausibility may be slight, it is still a thread. At this motion to dismiss stage, under New Jersey's broad remedial statute, Plaintiffs have sufficiently pled an unlawful affirmative act under the NJCFA.

### b.  Omissions

To establish an act of omission under the NJCFA, "plaintiff must show that defendant (1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the concealment." *Judge v. Blackfin Yacht Corp.*, 357 N.J. Super. 418, 425 (N.J. Super. Ct. App. Div. 2001) (citing *Leon*, 340 N.J. Super. at 469).

Widener cursorily asserts that because Plaintiffs failed to plead Widener intended the omissions, Plaintiffs' claims fail as a matter of law.  Mot. to Dismiss 17-29. The "heightened pleading standard of Rule 9(b) allows essential elements of the omission under the NJCFA, such as intent, to be alleged generally." *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494,

**FOR PUBLICATION**

500 (D.N.J. 2009); *see* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge and other conditions of a person's mind may be alleged generally"). Plaintiffs plainly accuse Widener of "engag[ing] in a pattern and practice of *knowingly and intentionally* making numerous false representations and omissions of material facts, *with the intent to deceive* and fraudulently induce reliance by Plaintiffs and the members of the Class." Am. Compl. ¶¶ 75, 90 (emphasis added). Plaintiffs have sufficiently pled intent. Similarly, through the same statement, Plaintiffs pled knowing concealment since, like intent, "knowing" can be alleged generally under Rule 9(b).

Plaintiffs allege Widener made material omissions "concerning [Widener]'s reputation with potential employers . . . concerning the value of a [Widener] degree . . . concerning the rate at which recent graduates can obtain gainful employment in their chosen field and [c]ausing students to pay inflated tuition based on . . . omissions, including, specifically that approximately 90-95 percent of [Widener] graduates secure gainful employment." Am. Compl. ¶ 90. These omissions are plausibly material. What makes the posted and disseminated employment rate misleading is the failure to include notice that the employment rate refers to all types of employment, that it is not specifically referring to law-related employment, and that the rate may have been inflated by selectively disregarding employment data (as example, failure to count the graduate if she responded "not seeking work"). *Id*. ¶ 36. Without these additional facts, Plaintiffs may have been misled to believe the employment rate referred to their post-graduate employment prospects in the legal sector, and not to employment generally. Plaintiffs have sufficiently pled a knowing omission under the NJCFA.

### 2.  Ascertainable Loss

17

**FOR PUBLICATION**

Typically, "to demonstrate a loss, a victim must simply supply an estimate of damages, calculated within a reasonable degree of certainty." *Cox*, 138 N.J. at 22. Additionally, the NJCFA, "does not require that the claim ultimately prove successful" since "[a] claim may be unsuccessful for any number of reasons even though it was brought in good faith and has support in the facts." *Weinberg v. Sprint Corp.*, 173 N.J. 233, 292 (N.J. 2002). Rather the Act seeks to "encourage . . . private causes of action." *Id.*

Widener claims Plaintiffs allege their ascertainable loss is an "inability to obtain a fulltime legal job having their benchmark salary of $92,000." Mot. to Dismiss 30. But this is a mischaracterization. Plaintiffs' Amended Complaint in fact seeks a remedy for "the difference between the inflated tuition paid by Class members based on the material representations that approximately 90-95 percent of graduates are employed within nine months of graduation and the true value of a WLS degree." Am. Compl. ¶ 90. Each Plaintiff asserts they "would not have paid the amount in tuition" had they "been aware of WLS's true job placement rate and salary statistics." *Id.* ¶¶ 17-25.

These pleadings are sufficient to meet NJCFA's broad standard for ascertainable loss. *See Miller v. American Family Publishers*, 284 N.J. Super. 67, 88 (N.J. Super. Ct. Ch. Div. 1995) ("[F]or their money, they received something less than, and different from, what they reasonably expected in view of defendant's presentations. That is all that is required to establish 'ascertainable loss'"); *Talalai v. Cooper Tire & Rubber Co.*, 360 N.J. Super. 547 (N.J. Super. Ct. Law Div. 2001) ("[O]ne has suffered an ascertainable loss under the New Jersey Consumer Fraud Act where that loss is measurable—even though the precise amount is not known.").

### 3. Causal Nexus

**FOR PUBLICATION**

The "'causal nexus' . . . is one of proximate cause." *Debra F. Fink, D.M.D., MS, PC v.*
*Ricoh Corp.*, 365 N.J. Super. 520, 955-56 (N.J. Super. Ct. Law Div. 2003). "Plaintiffs are
required to prove only that defendant's conduct was a cause of damages." *Id.* (quoting *Varacallo*
*v. Massachusetts Mut. Life Ins. Co.*, 332 N.J. Super. 31, 43 (N.J. Super. Ct. App. Div. 2000)).
And Plaintiffs "need not prove that [defendant's] conduct was the sole cause of damages." *Id.*

Widener describes Plaintiffs' causation theory as: "[i]f Widener's 2008 to 2011 graduates
actually had a 90% chance of obtaining a full-time legal job having a high salary to pay debt
obligations and to achieve a 'worthy' career, *then* Plaintiffs would have obtained such a job."
Mot. to Dismiss 31 (emphasis in original). Widener argues because job searches are "subjective,
and proof or disproof [is] extremely difficult," there is no causal nexus, and this Court should
dismiss the Amended Complaint "for public policy reasons" Mot. to Dismiss 32-33 (internal
quotations omitted).

Again Widener mischaracterizes Plaintiffs' Amended Complaint. The claimed causal
connection is between the allegedly misleading statements and Plaintiffs' inducement to buy
legal education from Widener, not whether Plaintiffs received a legal job. Am. Compl. ¶¶ 17-20.
Plaintiffs argue "they would not have paid over $30,000 a year in tuition had they known that
merely 56% of Widener graduates were employed in jobs that require or use a Widener law
degree." Opp'n to Dismiss 20. Plaintiffs have sufficiently pled a casual nexus to satisfy the
NJCFA.

The NJCFA is a broad remedial act. "[T]o counteract newly devised stratagems
undermining the integrity of the marketplace, 'the history of the [NJCFA] [has been] one of
constant expansion of consumer protection.'" *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557,

**FOR PUBLICATION**

576 (N.J. 2011) (quoting *Gennari v. Weichert Co. Realtors*, 203 N.J. 582, 604 (N.J. 1997)).

Under this expansive reach, Plaintiffs have pled a cognizable claim under the NJCFA.

### B. Delaware Consumer Fraud Act

The Delaware Consumer Fraud Act ("DCFA") declares in part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

6 Del. Code § 2513(a).

As both Plaintiffs and Defendants have observed, the NJCFA and the DCFA are "virtually identical in their pleading requirements." Opp'n to Dismiss 1; Mot. to Dismiss 17-18. The Delaware Supreme Court has described the NJCFA as "almost identical" and looked to New Jersey law to supplement its decision in *Brandywine v. Volkwagen, Ltd. v. State Dep't of Community Affairs & Economic Development, Division of Consumer Affairs.*, 312 A.2d 632, 634 n.4 (Del. 1973). Like the NJCFA the purpose of the DCFA is to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce." 6 Del. Code § 2512.

For reasons stated and discussed, Plaintiffs have plausibly pled "deception, misrepresentation, or . . . the . . . omission of any material fact" under the DCFA as under the NJCFA. 6 Del. Code § 2513(a).

### CONCLUSION

**FOR PUBLICATION**

At this stage, Plaintiffs have made plausible allegations, the credibility of which may well be determined only by the fact-finder, a jury. It follows then that Defendant's Motion to Dismiss is denied.

**s/ William H. Walls**
United States Senior District Judge